274 F.2d 606
 Henry PEDERSEN, Libellant-Appellant,
v.
MORRIS & CUMMINGS DREDGING COMPANY, Inc., Respondent-Appellee, and
THE Tug MARGARET A. MORAN and THE Scow NO. 22, and THE Tug KEVIN MORAN, INC., Moran Towing Corporation, Moran Towing & Transportation Co., and United States Lines, Respondents.
 No. 141.
 Docket 25845.
 United States Court of Appeals Second Circuit.
 Argued January 13, 1960.
 Decided February 3, 1960.
 
 Leon B. Ginsburg, New York City, for libellant-appellant, Cooper, Ostrin & De Varco, Herbert J. De Varco, Richard Gyory, New York City, of counsel.
 Edmund F. Lamb, New York City, for respondent-appellee.
 Lawless & Lynch, New York City, for respondent-appellee, Morris & Cummings Dredging Co., Inc., Purdy, Lamb & Cattoggio, New York City, of counsel.
 Before HAND, HINCKS and WATERMAN, Circuit Judges.
 PER CURIAM.
 
 
 1
 This is an appeal from a decree of the District Court for the Southern District of New York (Noonan, J. presiding), dismissing a libel to recover for injuries suffered by the libellant through the unseaworthiness of the "Scow No. 22," owned by the respondent, or by its negligence. The scow was being used to carry out and dump at sea dirt dug from the Hudson River off Pier 62. A dredge was filling three or four scows which a tug then towed to the dumping grounds. The libellant was the "scowman," whose only duty was to make fast and cast off the scow's fasts as she was made fast to, or cast off from, the pier, the dredge, or the tug. There was no one else on board. On the afternoon of June 15, 1956, the scow had been made fast alongside a pier in the river, and the libellant left it to go to his home in Brooklyn where his wife was ill. The scow was moored fore and aft at each end by a single six inch fast passing from a bitt on the scow to a bitt on the pier, around that bitt and back around the bitt on the scow, thus making a double fast at each end.
 
 
 2
 The scow was not to be ready to be towed out until about 1 p. m. on the next day, and the libellant rightly supposed that he would have no duties to perform until eleven or twelve the next morning, when she would have been filled where she lay. He testified that he came back at about 2 a. m. and wished to get aboard, but it was then high tide and the deck of the scow was about six feet above the edge of the pier. Finding no other way of boarding her he began to clamber up to her deck, hand over hand and foot over foot on the two strands of the after fast. (Whether the strands were separated at all does not appear; if so, it must have been by a very small space.) He further said that he had got up so far that both his arms and his left leg were on the deck of the scow, and his right foot was still on the ropes, when a tug — presumably the tug that was to tow away the scows — struck the "No. 22" with some violence and threw him upon her deck, which had no coaming for three or four feet inboard. In some way that he could not describe one or both strands of the fast got between his legs and severely injured his privates. His claim is that the scow was unseaworthy because no ladder or other means of ingress was left alongside by which he could have got on board safely. Judge Palmieri had precluded the respondent from putting in any evidence in rebuttal because it refused to answer interrogatories, so that the record comes up upon the libellant's evidence alone, except as to the extent of his injuries. Judge Noonan decided that, although the libellant had asked for a ladder, his injuries were "not caused by the respondent('s) * * * failure to supply him with a ladder," that the scow "was not unseaworthy," and that the respondent was not negligent. Moreover, he found that "an unattached and unsupported ladder would not be a safe method of ingress and egress." For these reasons he dismissed the libel.
 
 
 3
 The libellant's story is so confused that it is hard to gather from it any reliable conclusions. In the first place it does not appear why he chose to board the scow at two in the morning, when it was still dark, even in mid June. It would be most unreasonable to require the scow's owner to prepare for a seaman's return at such a time, ten or more hours before his duties began. Furthermore, the judge found that it would have been unseaworthy to attach the upper end of a ladder to the deck of the scow, and let the lower end rest upon the pier, and that was plainly right. So to rig a ladder would not take account of the effect of the flood and ebb of the tide, to say nothing of the changes of the scow's draught as she was loaded. If a ladder were left with one end free and resting on the pier, it would be impossible to forecast whether it would not fall off the pier as tide rose and be caught between the side of the scow as it ebbed, or whether the lower end would not be pushed out and away from the pier edge and broken when it encountered the side of the "shed" on the pier. Certainly it would be unreasonable to ask that the owner should station someone beside the ladder through the night to insure that its lower end should be in proper position at all stages of the tide. If the libellant on his return at two in the morning found nothing to help him board the scow except the ropes, he had the choice of waiting until it was light, and some other workmen arrived, or of hailing the tug, or of taking his chances on the ropes, as he did. The respondent was not charged with any duty to assist him to board the scow at that time of night.
 
 
 4
 There is, moreover, much reason to suppose that he was not on the ropes at all when the scow was hit by some other vessel. He was not thrown to the pier, as one would have expected from his position as he described it, but upon the deck of the scow, which was smooth from its edge for a distance of three or four feet inboard to a coaming that ran fore and aft, so that it would seem that he was pushed across the deck. Moreover, to his doctors he said that he was "working on the scow" at the time of the collision, and the libel alleged he was "engaged in his work * * * when he was knocked down and thrown against the side, bulwark, and hull of the vessel on which he was working. * * *" That was a very curious way to allege the facts to which he testified at the trial. That he must in some way have got astride of the ropes seems clear, but that might have happened, had he been thrown down after getting on board.
 
 
 5
 We can see no reason to hold that the findings were "clearly erroneous," and, as the law still remains (at least in form), it is necessary even in maritime cases to find some "fault" which was the cause of the injury. That there might be another basis of liability more accordant with our personal views is not material.
 
 
 6
 Decree affirmed.